[Cite as *State v. Gales*, 2011-Ohio-2682.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                     :

    Plaintiff-Appellee                   :          C.A. CASE NO.    24059

v.                                                :          T.C. NO.    09CR807/2

JERITT GALES                                      :          (Criminal appeal from
                                                             Common Pleas Court)

    Defendant-Appellant                  :

                                                  :

        . . . . . . . . . .

**O P I N I O N**

Rendered on the   3rd   day of    June   , 2011.

        . . . . . . . . . .

JOHNNA M. SHIA, Atty. Reg. No. 0067685, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

BYRON K. SHAW, Atty. Reg. No. 0073124, 4800 Belmont Place, Huber Heights, Ohio 45424
        Attorney for Defendant-Appellant

        . . . . . . . . . .

DONOVAN, J.

{¶ 1}  This matter is before the Court on the Notice of Appeal of Jeritt Phillip Gales, filed May 24, 2010.  On April 6, 2009, Gales was indicted on one count of aggravated robbery (deadly weapon), in violation of R.C. 2911.01(A)(1), a felony of the first degree;

one count of aggravated burglary (deadly weapon), in violation of R.C. 2911.11(A)(2), a felony of the first degree; one count of felonious assault (serious physical harm), in violation of R.C. 2903.11(A)(1), a felony of the second degree; two counts of theft ($500)(without consent), in violation of R.C. 2913.02(A)(1), felonies of the fifth degree; and one count of theft (R.C. 2913.71 property), in violation of R.C. 2913.02(A)(1), a felony of the fifth degree. Each of the indicted offenses included four firearm specifications. Gales pled not guilty.

{¶ 2} On April 28, 2009, Gales filed two motions to suppress. One of the motions contested the identification of Gales by means of a photo spread, and the other sought to suppress statements Gales made to the investigating police officer. After separate hearings on each motion, the trial court overruled both of them. Following a jury trial, Gales was found guilty of all offenses charged in the indictment and 11 of the 12 accompanying specifications. The trial court sentenced him to four years for aggravated robbery, five years for aggravated burglary, three years for felonious assault, all to be served consecutively, and one year for each theft offense, to be served concurrently with each other and the other offenses. The firearm specifications were merged into a single three year term to be served consecutively and prior to the definite term of imprisonment, for an aggregate term of 15 years.

I

{¶ 3} At the hearing on the first motion to suppress, Detective Kristine Beane testified. At the time, Beane had been a detective for 17 years. According to Beane, on March 17, 2009, she showed two of the victims herein, Theodore Bemis and Colin Hisey,

separate copies of a photo spread in their University of Dayton ("UD") apartment at 312 East Stewart Street. Beane was accompanied by Officer Harry Sweigart of the UD police department and Officer Randy Beane of the City of Dayton department. Beane stated that Gales became a suspect in the incident at issue following a Crime Stopper's tip received by the police department. Beane testified that she used the "JusticeWeb program" to assemble the photo spread. After entering Gales' photograph, Beane obtained multiple photographs of individuals with features similar to Gales'. Beane then selected five of the photographs and printed the photo spread. The computer program randomly arranged the photographs, and Gales' photo was in the fourth slot.

{¶ 4} According to Beane, she "went into the room and made contact with the victims. * * * I showed the photo spread to Theodore Bemis first, and I had Colin Hisey leave the room, go back into a bedroom, while I did this." Beane instructed the victims "not to talk about it." She testified that she had previously shown the victims another photo spread, which did not include a photograph of Gales. According to Beane, "We'd been through this before, and I told them we needed to keep them separated." After Bemis indicated that he remembered the procedure from the previous photo spread, Beane "went through the photographic show-up instructions with him. And I laid the photo spread on the coffee table in front of him, and he pointed to photo number 4, and he told me he was the person that had come to the apartment. * * * ." Bemis circled the photo of Gales, and he and Beane   signed the photo spread.

{¶ 5} According to Beane, after Bemis completed the identification, she "had him leave the room, and had Colin Hisey come out of the bedroom, and Theodore Bemis went

back into the bedroom. And I went through the same procedure again. I asked him if he remembered doing this on the other occasions. He said, 'Yes.' I went through the instructions with him, and placed the photo spread on the table in front of him. He pointed to photo number 4 and indicated that this was the person who had come to his door and force (sic) his way in. And he was also the person he had seen at the party the Saturday before." Hisey circled Gales' photo and signed the second photo spread. The photo spread that Bemis circled and signed was not visible to Hisey when Hisey made his identification.

{¶ 6} Beane testified that the apartment is small, and she "told [Bemis and Hisey] not to talk before we did this. They understood that. I watched them as the[y] passed. They made no motions to each other. * * * No comments at all." Beane stated, "It was very quiet, and actually, they just pointed to the photo. They didn't even say the number out loud." Beane stated that each victim's identification of Gales was immediate, and she did not employ promises, threats or coercion to obtain the identifications. Beane testified that, based on the identifications, she obtained a warrant for Gales' arrest.

{¶ 7} On cross-examination, Beane stated that the victims attended a party on March 7, 2009, and the incident occurred on March 9, 2009. According to Beane, Hisey told her that he observed Gales at the party on March 7th, and that Hisey identified Gales as "Little Jerry," or "Little Jeritt." Beane stated that Bemis initially told her that he did not see Gales at the party, but "[l]ater on he said he did, but the first time I talked to him he said he did not." Beane stated that Bemis told her, when he identified Gales' photo, that Gales was not armed when the incident occurred. Hisey told Beane that he "did see [Gales] with a weapon."

**{¶ 8}** In overruling Gales' motion to suppress the identifications, the trial court made factual findings consistent with Beane's testimony. The court noted that "the record is silent as to the reasons why the identification is improper. The State, however, has presented the following evidence to show that the testimony is reliable: 1) the witnesses who identified the Defendant as the perpetrator had an opportunity to see the Defendant at the time of the crime; 2) one witness noted that he had had contact with the Defendant two days prior to the incident and at a party; 3) that same witness stated the assailant was called 'Little Jerry' or 'Little Jeritt,' 4) each witness made his identification of the Defendant 8 days after the incident and 5) each witness made an immediate identification of the Defendant upon being shown the photographic array."

**{¶ 9}** The court concluded that "the process of creating the photo spread is not tainted or unreliable. The evidence indicates that the other photos were selected from the hundreds of photographs suggested by the computer. The place of the Defendant on the photo spread was the result of a random selection by the computer.

**{¶ 10}** "The manner in which the photographic arrays were shown to the witnesses was also not unduly suggestive. The witnesses were separated and given no opportunity to compare testimony. Then the detective read to (sic) a list of instructions to each witness before showing them the spread. Once shown the individual photo spreads the record reflects that each witness made a positive and immediate identification of the Defendant as their assailant. There was no stumbling and no hesitation."

II

**{¶ 11}** At the second suppression hearing regarding Gales' statements, Kristine

Beane again testified. According to Beane, she interviewed Gales on April 6, 2009 in the detective section on Third Street. Beane testified that at the start of the interview, she wrote Gales' identifying information on the top left portion of a pre-interview form. Beane stated that Gales was 20 years old at the time of the interview, had a GED and was able to read and write. Beane instructed Gales to read the first two lines of the pre-interview form to her to confirm his ability to read. Beane then read each of Gales' rights to him from the card, and after each one, Gales indicated his understanding thereof. When Beane read the waiver of rights paragraph, Gales indicated that he did not understand the word "coercion." Beane defined the word for him, and Gales acknowledged his understanding. Gales, and then Beane, signed the form.

{¶ 12} According to Beane, "when I asked him if he wanted to talk to me without a lawyer present, he told me that he'd already been contacted by a lawyer over at the jail. And he pulled out a business card for Patrick Mulligan." Beane asked Gales what he wanted to do, and she testified that Gales responded, "'I really want to talk to you.'" Gales told Beane that his mother had contacted Mulligan for Gales. Beane gave Gales her cell phone in the interview room, and Gales phoned Mulligan's office. According to Beane, she "could actually hear part of the conversation. I could tell that a female answered the phone, and he explained to her why he was calling. And they put him on the phone with - - it was a male voice. It sounded like it might have been an attorney. And they were telling him that he - - that Jeritt had not retained them yet as their attorney. And, you know, they weren't coming over. And they also told him, 'You shouldn't talk to the d - - they asked him where he was at, and he said he was at the jail. And they told him he shouldn't talk without a

lawyer being there." When the phone call ended, Beane again asked Gales what he wanted to do, and she testified that Gales responded, "'I really want to talk to you.'" Beane advised him that he could "come back and talk" to her once he retained a lawyer, or that one could be appointed for him. Beane testified that Gales again told her that he wanted to talk to her, and that Gales stated, "'I'm tired of waiting. I'm going to do it now.'" Gales then proceeded to make statements.

{¶ 13} According to Beane, in the course of the interview, she did not make any promises to Gales or threaten him. Beane stated that she left the room at one point and returned after about 15 minutes, and she did not read Gales his rights again upon her return. Gales did not terminate the interview or ask for an attorney, but at "the very end, he didn't want to write out a statement without his attorney."

{¶ 14} On cross-examination, the following exchange occurred:

{¶ 15} "Q. And additionally, while Jeritt was on the phone with Mr. Mulligan's office, according to your report, Jeritt told the attorney that he wanted an attorney to come over while he talked with a detective; isn't that right?

{¶ 16} "A. That's correct.

{¶ 17} "Q. So that was Jeritt's request to the attorney, was to have an attorney present while he spoke with you?

{¶ 18} "A. He was asking them to come over, yes.

{¶ 19} "Q. Right. And you heard him ask that, correct?

{¶ 20} "A. That's correct.

{¶ 21} "Q. Okay. And no attorney ever came, correct?

**{¶ 22}** "A.   No, they told him they were not coming.

**{¶ 23}** "Q. * * * Well, was Jeritt saying, 'I want an attorney to come and sit with me while I'm interviewed by this detective,' and you knowing that they hadn't been retained, or you finding that out at that time, why didn't you seek to get him a Public Defender at that time?

**{¶ 24}** "A.   I explained to him that I didn't have an attorney there at that time, and we could wait until he got one.   And his - - he continually would say, 'I really want to talk to you.'   And I - - I told him we could wait until he got an attorney.   And he just says, 'I'm going to talk to you.   I want to talk to you now.'

**{¶ 25}** "* * *

**{¶ 26}** "Q.   Well, on the phone he asked an attorney [to] come over and be with him, and in your rights form number 3 says, 'You have a right to have a lawyer with you during questioning,' and number 4 says, 'If you don't have the money to hire a lawyer, Public Defender's Office or some Court-appointed attorney can be appointed to - - will be provided for you during questioning.'   You knew that his desire was to have an attorney with him during the questioning, yet you took no steps to get him an attorney; is that right?

**{¶ 27}** "A.   I did.   I gave him my phone so he could call the attorney that had gone to see him at the jail.   And even after all that, I told him we could wait until he either hired one, and I told him a Public Defender could be appointed to him, and we could wait until that happened.

**{¶ 28}** " * * *

**{¶ 29}** "A.    And he still continued to say, 'I want to talk to you.'

{¶ 30} "Q.  Well, you knew that he wanted an attorney to be with him.

{¶ 31} "A.  He didn't want to wait.

{¶ 32} "Q.  Well - -

{¶ 33} "A.  It was his decision."

{¶ 34} In overruling Gales' motion to suppress his statements, the trial court made factual findings consistent with Beane's testimony.  The court determined that Gales was in custody at the time of the interview and entitled to the protections articulated in *Miranda v. Arizona* (1966), 384 U.S. 4436, 86 S.Ct. 1602, 16 L.Ed. 2d 694.  The court further concluded that Gales "suffered no constitutional deprivation when he was interviewed by Detective Beane."  According to the court, the "evidence shows that Detective Beane took considerable time going over the pre-interview form with Mr. Gales.  Although, she ascertained that he could read, the Detective read and explained to Gales each right before moving on [to] the next.  She defined words that she thought he might not understand such as 'coercion' before moving on.  And the Defendant was given an opportunity to ask questions about his specific rights prior to asking him if he desired to waive those rights.  Mr. Gales gave an express waiver of his constitutional rights by signing the document.

{¶ 35} "Although, the record shows that Mr. Gales hesitated when asked if he wished to talk to Detective Beane, the record also makes clear that Detective Beane gave Mr. Gales ample opportunity to get an attorney.  Beane gave the Defendant her cell phone to call the office of the attorney whom Gales wanted to hire to represent him.  When it was revealed that this attorney had not been retained, the Detective offered to get a member of the Public Defender's Office to represent him.  After these actions occurred, the Defendant

decided he did not want to wait any longer and made his statement.

{¶ 36} "Based upon a careful review of the facts concerning the interrogation, this Court finds that the Defendant, Jeritt Gales, was given *Miranda* rights warnings prior to his interrogation by Detective Beane. The rights were explained to him in depth. The Court further finds that after receiving the rights by the police officer, the Defendant made an express waiver of his rights. And that statement was the result of a knowing, intelligent and voluntary waiver."

III

{¶ 37} At the trial, Colin Hisey testified that he was a chemical engineering student at UD. According to Hisey, on the date of the incident, he and Theodore Bemis resided at 312 East Stewart St., Apartment 3-C, which is on the UD campus. On the evening of March 9, 2009, Hisey testified that he and Bemis were at home, and that their friends, Brian Titgemeyer and John Shockey, were visiting the apartment. Hisey was setting up a video game, and all the men had been smoking marijuana. They ordered pasta for delivery, and at approximately 9:00 p.m., when the buzzer from the secured front door of the apartment building sounded, Hisey assumed that it was the delivery man. Hisey unlocked the front door without asking who was there. He then observed Gales and someone else he did not recognize through the peephole in his apartment door. Hisey stated that in the past he had purchased "fairly large amounts of low grade marijuana" from an acquaintance, and that Gales had been present at the home of the acquaintance once or twice during Hisey's marijuana buys.

{¶ 38} Hisey stated that he opened the door a couple of inches and braced it with his

right foot. According to Hisey, he asked Gales, "what's going on," and at that point "a third person came from around the stairwell right next to my door and had a rifle and began to force his way into the door. He originally had the barrel pointed directly at my face, so I still had the door braced and I grabbed it with my left hand and just kind of pushed it towards the ceiling instinctively to get it away from my face." Gales and the other man began to push on the door, and Hisey stated that he was pushed back into his apartment. According to Hisey, the three intruders came into the apartment, and the one with the rifle struck Hisey's forehead with the weapon, knocking him to the ground. The man with the rifle yelled at Hisey not to look at him and to turn his face toward the floor.

{¶ 39} From the floor, Hisey observed another of the intruders, with a pistol in his hand, proceed to one of the bedrooms, accompanied by Gales. The man with the rifle told Hisey to crawl forward and keep his head down, and Hisey complied. Hisey then observed Shockey laying down next to him, along with Titgemeyer. According to Hisey, Bemis was sitting in a corner, "bleeding profusely from his forehead and the guy with the pistol was standing over him." Hisey stated, when "we were laying there, [Gales] originally went back into my bedroom and started rummaging around." Hisey continued, "after [Gales] went through my room, he came out here and yelled at us where is it. And I kept saying, I don't know what you're talking about, I don't have anything. And then he went over into Teddy's room." As Gales ransacked the bedrooms, the man with the rifle instructed the men on the floor to empty their pockets. After they did so, the three intruders ran out of the apartment. Hisey stated that the intruders were in the apartment for about five minutes. Hisey testified that throughout the incident, he did not observe a weapon in Gales' possession.

{¶ 40} After the intruders left the apartment, Hisey stated that he locked the door and "everyone kind of got up and was just freaked out. No one understood what had happened or why." Hisey observed that Bemis had a large laceration near his hairline with "blood pouring down the side of his face," and he gave Bemis a towel and told him to apply pressure to the wound.

{¶ 41} Hisey stated that he did not immediately contact the police because he "knew that my apartment smelled like weed from when we smoked earlier and I was afraid I was going to get in trouble." Hisey first "made sure that [Bemis] went to the hospital" with a neighbor downstairs. According to Hisey, Shockey and Titgemeyer left the apartment because "we thought if they weren't there they wouldn't get in any trouble." Hisey stated that he felt the incident was "largely my fault," because he "had been selling marijuana for three or four months to my friends and from what I had seen that was the reason that they were there."

{¶ 42} After Bemis, Shockey and Titgemeyer left the apartment, Hisey eventually called the police. Officers arrived within two to three minutes, and in speaking to them, Hisey stated that he "left out how I knew Jeritt and I left out that I had been selling. I left out that [Titgemeyer] and [Shockey] were there." Regarding Gales, Hisey told the police that he "had met him at a party that weekend and that I had told him that we should hang out or something." Hisey "lied because I was scared." Hisey testified that he provided written statements to the University of Dayton Police and the Dayton Police Department that were consistent with his oral statements to the officers. Hisey later wrote a third statement in which he purportedly provided an accurate account of the crimes.

{¶ 43} Hisey stated that his laptop computer, for which he paid $2000.00, his wallet containing $50.00, his cell phone and his keys were taken from him. He stated that the police found the power cord from the missing computer in the bushes across the street, but that the other items were not found. Hisey testified that he identified Gales in a photo spread.

{¶ 44} On cross-examination, Hisey stated that at the time of the incident, he smoked marijuana on a daily basis and had been doing so for two hours when Gales arrived at the apartment. He testified that he had been to a party on March 7, 2009, at Titgemeyer's apartment, and that he told the investigating officers that "somebody named Little Jerry had been at that party," and that he told "Little Jerry" that he lived upstairs and that "Little Jerry" could stop by and "smoke weed." In his third statement to the police, six months after the incident, Hisey admitted that Gales had not been at Titgemeyer's party, and he admitted to the police that he had "left out a lot of things" in his initial statements.

{¶ 45} Titgemeyer testified that he was a political science student at UD at the time of the incident, living in apartment 2-D at 312 East Stewart Street. Titgemeyer stated that one of the intruders had a handgun, and that that man pushed Titgemeyer to the floor, where Titgemeyer remained. When he looked up, the man with the handgun pointed the weapon to Titgemeyer's head and told him to turn around. Titgemeyer stated that he was kicked in the side. After the incident, Titgemeyer left the apartment and walked around campus to calm down. When he returned to his apartment building, he went upstairs where the police were investigating, and he testified that he "just made everything up on the spot." Titgemeyer denied being in the apartment at the time of the incident and he denied knowledge of the robbery. Titgemeyer stated that he told the truth to the police six months

later. He stated that he was shown a photo spread and did not identify Gales, but that he did identify the man who pointed the handgun at him.

{¶ 46} Shockey testified that he was a sophomore at UD, living in a dorm at the time of the incident. Shockey stated he was in Hisey's room when he heard the knock on the door, followed by Hisey yelling. Shockey looked into the living area and observed the tip of a rifle sticking into the room. Shockey initially turned back into the bedroom, but then he walked into the living area slowly with his hands in the air. He observed the three intruders, whom he did not recognize, in the room. One of them, who carried a pistol, pointed the weapon at Shockey, grabbed him with his other hand, turned him around, and told him to get on the floor and put his hands on his head. Shockey complied. After the men left, Shockey returned to his dorm. According to Shockey, he spoke to the police in September, 2009, and he made a statement to them that was consistent with his trial testimony.

{¶ 47} Bemis also testified. According to Bemis, also a chemical engineering student, he was packing books in his bedroom when the incident occurred. Bemis heard a "loud smack," and when he peered out of his room, he observed Hisey trying to keep the front door closed, and also the barrel of a rifle protruding into the room. When Hisey fell backwards, Bemis stated that the man with the rifle, a man with a pistol, and another man, entered the room. Bemis ran to the bathroom with his cell phone in his hand, and the man with the pistol ran after him. Upon entering the bathroom, the man with the pistol struck Bemis in the head. The man then told Bemis to get down on the floor outside of the bathroom. Bemis felt blood "rushing" down his face, and he was in pain and confused.

Bemis observed Gales ransacking his bedroom, and he testified that when the men left, Bemis' laptop computer, for which he paid $1600.00, and his cell phone were missing. He stated that he received "21 stitches, three layers deep," at the hospital for his head wound.

{¶ 48} Bemis stated that he was contacted by the police while he was at the hospital, and that he initially "left out that John Shockey and Brian Titgemeyer were in there. I also didn't inform them that we were smoking and selling drugs." Bemis stated that he told police "everything" in September, 2009. Bemis stated that he identified Gales in a photo spread as the unarmed man, and that he did so while Hisey was in another room. Bemis stated that he was not present in the room when Hisey viewed the photo spread. Bemis testified that the night of the incident was the first and only time he had seen Gales.

{¶ 49} Jonathan Pease, a UD police officer, testified that he responded to 312 East Stewart Street based upon a City of Dayton police department robbery broadcast around 10:00 p.m. According to Pease, the "living room was in total disarray, stuff scattered all over. Blood in the middle of the floor. It was ransacked from the front to the back." Pease noticed the smell of "unburned marijuana." Pease spoke to Hisey, and he observed marks on his head and face. Hisey clearly answered Pease's questions and did not appear confused. Pease also spoke to Titgemeyer, as well as a witness at 341 East Stewart Street named Cara Perlow.

{¶ 50} Patricia Lehan testified that she was a senior at UD, and that at the time of the incident, she was on her way to a dance marathon meeting. As she walked through the parking lot of 312 Stewart Street, she "saw three men run across Stewart Street and get into a car. They dropped a few things in the bushes and were frantically picking them up."

Leehan thought the behavior she observed was suspicious, but she did not call police and continued to her meeting. As she later walked home an hour later, she observed "police cars everywhere." On cross-examination, Lehan stated that she was not close enough to the men to observe their facial features, hairstyles or what they were carrying. She stated that she could not identify any of the men.

{¶ 51} Cara Perlow testified that she was student at UD, and at the time of the incident, she was packing her car. According to Perlow, she walked to a nearby convenience store to get a bottle of water, and as she walked back up Stewart Street to her apartment, Perlow heard noise coming from Apartment Building 312. She turned around and observed "three black males running out." One of the males carried "a big box." Two of the men were "around the same height, average height. One was a little bit smaller, shorter." According to Perlow, the men were wearing dark clothing. Perlow stated that it was dark outside, but the parking lot was well-lit. The men ran to a "sedan-like" car, and two "of them got into the car and the one carrying the box tripped and fell, spilling some of the items." Perlow described the men as "flustered" and "in a hurry." Perlow observed the barrel of a gun under one of the arms of the men. Perlow was unable to see the license plate of the vehicle, and she did not identify Gales.

{¶ 52} Officer Sean Humphrey of the City of Dayton Police Department testified that he was dispatched to 312 East Stewart Street on the night of the incident. Humphrey spoke to Hisey, and he testified that Hisey "seemed very agitated, upset. We tried to talk to him, tried to get him to do a written statement, and he was kind of getting up and down, unable to really focus on what we asked him to do." Humphrey stated that the apartment

appeared "like somebody came in there and * * * ransacked it looking for something." After learning that Bemis was at the hospital, Humprey proceeded there.

{¶ 53} Humphrey stated that Bemis "was able to focus a little bit more and provide me with some statements and a written statement of what occurred." Humphrey photographed Bemis' injury. Humphrey stated that he then returned to the scene, and from there he walked to Perlow's apartment. After speaking with Perlow, Humphrey went to an area in the parking lot almost directly across from 312 East Stewart Street, where he observed "power cords to some type of electronic device, maybe a computer." Humphrey collected the cords, took them to the apartment and gave them to Hisey.

{¶ 54} Finally, Detective Beane testified for the State. She described her investigation, and she testified that she showed the photo spreads containing Gales' photograph to Hisey and Bemis on March 17, 2009. Beane testified that she read the instructions and showed the photo spread to Hisey first, and that she "had Ted go back into the back bedroom so they would be separated." Hisey circled Gales' photograph and signed the photo spread. Then Beane "had Colin go back in the bedroom and Ted sat down at the couch." She stated that Bemis and Hisey were told not to speak to each other as they passed by, and Beane stated that they did not speak. Beane again read the instructions to Bemis, who circled Gales' picture and signed the photo spread. Beane stated that she received additional information involving the case in September, 2009, and she accordingly re-interviewed some of the witnesses.

{¶ 55} On cross-examination, Beane indicated that there were no fingerprints found that linked Gales to the scene. She stated that when she re-interviewed Hisey and Bemis,

the students "added things" to their original version of events and also recanted part of their statements.

{¶ 56} Gales asserts three assignments of error. His first assignment of error is as follows:

{¶ 57} "THE TRIAL COURT ERRED BY NOT SUPPRESSING JERRITT (sic) GALES' PHOTO SPREAD IDENTIFICATION EVIDENCE BY TWO KEY PROSECUTION WITNESSES WHEN THE PHOTO SPREAD PROCEDURE WAS UNDULY SUGGESTIVE WITH WITNESSES BEING NEARBY EACH OTHER OR WITHIN LISTENING RANGE ALONG WITH ADMITTED DRUG USAGE DURING THE TIME OF THE IDENTIFICATION BESIDES BOTH IDENTIFICATIONS BEING UNRELIABLE AND CONTRADICTORY TO EACH OTHER."

{¶ 58} "Appellate courts give great deference to the factual findings of the trier of facts. (Internal citations omitted). At a suppression hearing, the trial court serves as the trier of fact, and must judge the credibility of witnesses and the weight of the evidence. (Internal citations omitted). The trial court is in the best position to resolve questions of fact and evaluate witness credibility. (Internal citations omitted). In reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's factual findings, relies on the trial court's ability to assess the credibility of witnesses, and independently determines whether the trial court applied the proper legal standard to the facts as found. (Internal citations omitted). An appellate court is bound to accept the trial court's factual findings as long as they are supported by competent, credible evidence. (Internal citations omitted)." *State v. Purser*, Greene App. No. 2006 CA 14, 2007-Ohio-192, ¶ 11.

{¶ 59} We summarized the guidelines for determining the admissibility of identification testimony in *State v. Marshall*, Montgomery App. No. 19920, 2004-Ohio-778, ¶ 11,as follows: "Due process requires suppression of pre-trial identification of a suspect only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. (Citation omitted). To establish a due process violation, a defendant must prove that the out of court confrontation was 'unnecessarily suggestive and conducive to irreparable mistaken identification.' (Citation omitted). However, even where the identification procedure is suggestive, so long as the challenged identification itself is reliable, it is still admissible." (Citations omitted).

{¶ 60} "When an eyewitness to a crime is shown a series of photographs in an effort to identify a perpetrator, and the manner or mode of the presentation suggests that one individual is more likely than the others to be the perpetrator - such as when the photograph of one individual is in some way emphasized - undue suggestions may occur, increasing the likelihood of misidentification and violating the due process rights of a defendant so identified. (Citations omitted). * * * Reliability of the identification is the linchpin in determining admissibility. (Citation omitted). * * * Reliability is determined from the 'totality of the circumstances,' which includes the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated, and the time between the crime and the identification procedure." (Citation omitted). *State v. Robinson* (Jan. 26, 2001), Montgomery App. No. 17393.

{¶ 61} According to Gales, his "identification through the photo array was unduly

suggestive since the Police questioned witnesses that already knew Appellant from a campus party the previous night." Further, Gales asserts, the "key witnesses" were questioned "within listening range" of each other. Also, Gales argues that the witnesses "were influenced by drug usage" when they identified Gales. Finally, Gales asserts, "Bemis told Police that there was no gun and that he didn't see Appellant at the party the previous night. However, * * * Hisey told Police that he saw Appellant with a gun and that he recognized Appellant from being at the campus party the previous night."

{¶ 62} We agree with the State that the record before us establishes that the identifications were reliable and the procedure utilized by Detective Bean was not suggestive in any fashion. Beane testified that she included Gales in the photo spread based upon a Crime Stoppers tip. The computer program randomly placed Gales' photograph in the fourth slot, and Gales' image was not emphasized in the array. The remaining photos were selected by the computer program based upon comparable physical characteristics. Bemis and Hisey had the opportunity to observe Gales at the time of the incident, and they identified him just eight days later. Bemis and Hisey "immediately" and separately identified Gales by silently pointing to his photograph, and they did not communicate with each other during the process. Hisey did not view the photo spread marked by Bemis before making his identification. Beane did not employ threats, promises or coercion to obtain the identifications. There was no evidence adduced at the suppression hearing regarding alleged "drug usage" by Bemis and Hisey at the time of the identifications. Hisey identified Gales by name as "Little Jerry" or "Little Jeritt." The fact that Bemis and Hisey told Beane that they had seen Gales before the incident at a party, and the fact that their testimony was

inconsistent regarding whether Gales was armed in the course of the robbery, does not undermine the reliability of their separate, immediate and certain identifications of him in the photo spread as one of the intruders.

{¶ 63} Since, under the totality of the circumstances, reliability is demonstrated and the photo identifications were not unduly suggestive, the trial court properly overruled Gales' motion to suppress the identifications, and Gales' first assigned error is overruled.

{¶ 64} Gales' second assigned error is as follows:

{¶ 65} "THE TRIAL COURT ERRED BY NOT SUPPRESSING JERRITT (sic) GALES' STATEMENTS SINCE THE STATEMENTS WERE RETRIEVED AFTER THE DEFENDANT HAD TOLD LAW ENFORCEMENT THAT HE WAS REPRESENTED BY AN ATTORNEY AND THAT HE HAD BEEN ADVISED NOT TO SPEAK WITH THE POLICE WITH OFFICER(S) OVER-HEARING APPELLANT'S PHONE CALL WITH THE ATTORNEY STATING NOT TO TALK TO THEM."

{¶ 66} The United States Supreme Court determined that the State may not use statements arising from a defendant's custodial interrogation unless it establishes that procedural safeguards were employed to protect the defendant's privilege against self-incrimination. *Miranda*. The State must establish that the defendant knowingly, voluntarily and intelligently waived his rights. Id.*; State v. Edwards* (1976), 49 Ohio St.2d 31, 38, overruled on other grounds, (1978), 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155.

{¶ 67} "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of the

interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *Edwards,* at syllabus. "And while an express written statement waiving the right to remain silent or the right to counsel is not necessarily sufficient in all cases (citation omitted), such a written waiver does provide considerable weight to the 'totality of circumstances' which must be examined in determining if statements made by an accused during custodial interrogation are admissible in evidence." *State v. Williams* (Jan. 28, 1987), Montgomery App. Nos. 9597, 9815.

{¶ 68} "Police officers must immediately stop questioning a suspect who clearly asserts his right to counsel. (Citation omitted). But '[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.' *Davis v. United States* (1994), 512 U.S. 452, 461-462, 114 S.Ct. 2350, 129 L.Ed.2d 362 (further citation omitted). A suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police office in the circumstances would understand the statement to be a request for an attorney.' *Davis*, 512 U.S. at 459.

{¶ 69} "In *Davis*, the U.S. Supreme Court held that the statement 'Maybe I should talk to a lawyer' did not invoke the right to counsel. Id. Similarly, the Supreme Court of Ohio has found that statements such as 'I think I need a lawyer,' 'don't I supposed to have a lawyer present,' and 'could I call my lawyer' (followed by an affirmative response) do not invoke a right to counsel." (Citation omitted). *State v. Wild*, Clark App. No. 2009 CA 83, 2010-Ohio-4751, ¶ 49-50.

{¶ 70} As the State notes, Gales does not dispute that he was advised of his rights, and he does not assert that he did not understand them. Beane confirmed that Gales could

read, she allowed him to ask questions, and when he indicated that he did not understand the word "coercion" in the waiver of rights paragraph, she defined it for him. Gales signed the waiver of rights.

{¶ 71} Although Gales phoned the Mulligan law office (with a phone provided by Beane), no attorney there had been retained to represent him. When Beane learned that Gales did not have a lawyer privately retained, she informed him that they could talk later after he retained a lawyer or had one appointed. Even after being advised by someone at the law firm not to speak to the detective without a lawyer present, Gales repeatedly told Beane that he wanted to talk to her, and that he was tired of waiting. Gales stated that he wanted to talk to Beane "now." In other words, Gales did not clearly assert his right to counsel such that Beane had an obligation to stop the interview. Gales never affirmatively indicated to Beane that he would not speak to her without an attorney present. Nor did he invoke his right to remain silent.

{¶ 72} There being no merit to Gales' second assigned error, it is overruled.

{¶ 73} Gales' third assigned error is as follows:

{¶ 74} "APPELLANT'S CONVICTION AND SENTENCE IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 75} According to Gales, he "was identified in an unduly suggestive photo spread by key witnesses who were admittedly using drugs at the time and whose statements to the Police were completely contradictory re seeing Appellant with or without a gun and whether they knew Appellant since they did or did not see him the previous night at a party.

{¶ 76} "Moreover, Appellant's constitutional rights were continually violated

through Police questioning after he advised them that he was represented by Counsel and spoke with an attorney over the phone in which Police could hear the attorney from Patrick Mulligan's office advise Appellant not to talk to them."

{¶ 77} "When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (Internal citations omitted).   Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Dossett*, Montgomery App. No. 20997, 2006-Ohio-3367, ¶ 32.

{¶ 78} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve.   *State v. DeHass* (1997), 10 Ohio St.2d 230, 231. "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility.   The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288.

{¶ 79} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in

arriving at its verdict. *State v. Bradley* (Oct. 24, 1997), Champaign App. No. 97-CA-03.

{¶ 80} After a complete analysis above, we determined that the photo spread identifications of Gales were reliable and also that Gales did not assert his right to counsel such that Beane was required to stop questioning him.  Gales provides no further basis for his assertion that his convictions are against the manifest weight of the evidence, and having reviewed the entire record, weighed all of the evidence, and deferring to the jury's assessment of credibility, we cannot conclude that this is an exceptional case where the evidence adduced weighs heavily against Gales' convictions.  Hisey stated that Gales was present when Hisey purchased marijuana to sell to his friends, and Hisey believed that his drug activity motivated the intrusion into their apartment. Hisey and Bemis described their injuries and the property that was taken from them.  They identified Gales in a reliable manner, and any inconsistency in their testimony regarding whether Gales was armed is largely immaterial.  *State v. Hutchinson*, Montgomery App. No. 23648, 2010-Ohio-5752, ¶ 28 ("In Ohio, it is well-established that an accomplice 'shall be prosecuted and punished as if he were a principal offender.'  R.C. 2923.03(F)").  Pease's description of the apartment's appearance and the smell of marijuana corroborated the victims' testimony.  Hisey, Bemis, Titgemeyer and Shockey testified consistently regarding their initial and subsequent statements to police.  Lehan and Perlow each observed three men running from the apartment building with property in their possession at the time of the incident, and Perlow also observed the barrel of gun. Humphrey retrieved Hisey's power cord from the area where Lehan and Perlow observed the intruders drop items. Gales' convictions are not against the manifest weight of the evidence, and his third assigned error is overruled.

**{¶ 81}** The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and KLINE, J., concur.

(Hon. Roger L. Kline, Fourth District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).

Copies mailed to:

Johnna M. Shia
Byron K. Shaw
Hon. Frances E. McGee